**Errol "Romo" ROMERO, Sheriff of Iberia Parish, Louisiana**

v.

**UNITED STATES of America.**

**Civ. A. No. 94–0419.**

United States District Court,
W.D. Louisiana,
Lafayette–Opelousas Division.

Dec. 8, 1994.

Memorandum Denying Amendment of Findings But Altering Judgment,
Feb. 6, 1995.

**NIED** as moot.

John C. Holleman, Holleman & Little, New Iberia, LA, for plaintiff.

Michael D. Skinner, U.S. Attorney's Office, Lafayette, LA, Pamela J. Eppli, U.S. Dept. of Justice, Washington, DC, for defendant.

Judy P. Martinez, Simon Peragine Smith & Redfearn, New Orleans, LA, for Amici Curiae Handgun Control Inc., Center to Prevent Handgun Violence, Major Cities Chiefs of Police, Intern. Ass'n of Chiefs of Police, Nat. Ass'n of Police Organizations, Fraternal Order of Police, Police Foundation, Federal Law Enforcement Officers Ass'n, Police Executive Research Forum, Nat. Troopers Coalition, Nat. Organization of Black Law Enforcement Executives, Intern. Broth. of Police Organizations.

## MEMORANDUM RULING

DOHERTY, District Judge.

This matter comes before the Court on plaintiff's complaint seeking both declaratory and injunctive relief against the defendant, the United States of America. Plaintiff seeks an order of this Court enjoining enforcement of portions of § 102(a) of P.L. 103–159, 107 Stat. 1536 (1993), and § 302(d), 107 Stat. 1545. Both provisions were enacted as part of the Brady Handgun Violence Prevention Act ("Brady Act") as an amendment to the Gun Control Act of 1968.

Plaintiff's complaint was filed on March 7, 1994, and on that date, a status conference was held before Judge Rebecca F. DOHERTY wherein plaintiff's request for a temporary restraining order was denied. The parties briefed the Court on plaintiff's Motion for a Preliminary Injunction. On May 11, 1994, the Court and counsel agreed to consolidate trial on the merits in this matter with the preliminary injunction hearing, pursuant to Fed.R.Civ.Pro. 65(a)(2), with all evidence to be submitted in supplemental briefs and joint stipulations of the facts. Thereafter, another status conference was held on August 2, 1994, wherein the Court requested additional briefing from the parties. Additional briefing was received and this Court now issues its ruling.

### The Brady Act

The Brady Handgun Violence Prevention Act, enacted in 1993, imposes new restrictions on transfers of handguns throughout the nation. In enacting the Brady Act, Congress chose to impose new, more difficult hurdles to obtaining ownership of handguns. Section 102(a) of the Brady Act is entitled "Interim Provision," and establishes the rules for handgun transfers until the early part of the year 1999. This interim provision imposes certain duties upon local law enforcement officers, and it is these provisions which are challenged by plaintiff herein as inconsistent with the Tenth Amendment to the United States Constitution. These provisions are as follows:

"A chief law enforcement officer to whom a transferor has provided notice pursuant to paragraph (1)(A)(i)(III) *shall make a reasonable effort to ascertain within five (5) business days* whether receipt or possession would be in violation of the law, including research in whatever State and local record-keeping systems are available and in a national system designed by the Attorney General." § 102(a), codified at 18 U.S.C. § 922(s)(2) (emphasis added).

"Unless the chief law enforcement officer to whom a statement is transmitted ... determines that a transaction would violate Federal, State, or local law—(i) the officer *shall,* within twenty (20) business days ... *destroy the statement, any record containing information derived from the statement, and any record created as a result of the notice required ...*" 102(a), codified at 18 U.S.C. § 922(s)(6)(B)(i) (emphasis added).

"If a chief law enforcement officer determines that an individual is ineligible to receive a handgun and the individual requests the officer to provide the reason for such determination, the officer *shall provide the reasons* to the individual *in writing within twenty (20) business days* after

receipt of the request." § 102(a), codified at 18 U.S.C. 922(s)(6)(C) (emphasis added).

In addition to the Tenth Amendment challenge, plaintiff also challenges the criminal sanctions provision of the Brady Act, asserting that it is unconstitutionally vague in violation of the Due Process Clause of the Fifth Amendment. *"Whoever* knowingly violates subsection (s) or (t) shall be fined not more than $1,000.00, imprisoned for not more than one (1) year or both." 18 U.S.C. § 924(a)(5).

### Stipulated Facts [1]

Sheriff Errol Romero is the Chief Law Enforcement Officer, as defined by the Brady Act, for the Parish of Iberia, State of Louisiana. As Sheriff, Mr. Romero has responsibility for performing various civil functions as well as criminal interdiction throughout Iberia Parish. Due to lack of sufficient funding, Sheriff Romero does not have the ability both to completely fulfill his duties as defined by the State of Louisiana and to undertake the additional duties mandated by the Brady Act.

### Due Process

Sheriff Romero seeks a declaratory judgment that the criminal sanctions provision of the Brady Act is unconstitutionally vague in violation of the Due Process Clause of the Fifth Amendment to the United States Constitution, as well as an injunction prohibiting enforcement against himself of that provision. Defendant has challenged Sheriff Romero's standing to seek equitable relief concerning the criminal sanctions provision.

In order to assert a claim for equitable relief, a party must satisfy the jurisdictional requirements of this Court. The primary jurisdictional requirement is that a claim presents a "case or controversy," as found in Art. III of the United States Constitution.[2] In order to present a case or controversy, a plaintiff must have standing to bring his claim.[3] The United States Supreme Court recently reiterated the standing doctrine's requirements: (1) An injury in fact which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical; (2) a causal connection between the injury and the conduct complained of; (3) and a likelihood that the injury will be redressed by a favorable decision.[4] The party invoking federal jurisdiction bears the burden of establishing these elements.[5]

By his own admission, Sheriff Romero is not enforcing the provisions of the Brady Act,[6] and claims to be in peril of criminal prosecution for knowingly violating the terms of the federal law. By this admission, Sheriff Romero seeks to establish that the harm of prosecution is sufficiently imminent to satisfy the standing requirement.

The only entity which is legally authorized to enforce the criminal sanctions contained in the Brady Act is the United States Department of Justice. The Office of Legal Counsel of the United States Department of Justice has issued a memorandum finding that the Brady Act's criminal penalties "do not apply to [local law enforcement officers] in performance of their duties under the Act."[7]

---

1. As found in the Joint Stipulation of Facts ["Stipulation"] dated June 1, 1994, as well as affidavits referenced therein.

2. U.S. Const. Art. III, § 2, cl. 1 states:
   The judicial Power shall extend to all Cases, in Law and Equity arising under this Constitution, the Laws of the United States and Treaties made, or which shall be made, under their Authority;—to all Cases affecting Ambassadors, other public Ministers and Consuls;—to all Cases of admiralty and maritime Jurisdiction;—to Controversies which the United States shall be a Party; to Controversies between two or more States;—between a State and Citizens of another State;—between Citizens of different States;—between Citizens of the same State claiming Lands under Grants of different States, and between a State, or Citizens thereof, and foreign States, Citizens or Subjects.

3. *Allen v. Wright,* 468 U.S. 737, 750, 104 S.Ct. 3315, 3324, 82 L.Ed.2d 556 (1984).

4. *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 559–61, 112 S.Ct. 2130, 2136, 119 L.Ed.2d 351 (1992).

5. *Id.*

6. Stipulation, Paragraph 3.

7. Defendant's Opposition to Plaintiff's Motion for a Preliminary Injunction, Exh. 2, at 1.

In making this finding, the Office of Legal Counsel states that enforcement of the criminal penalty provision would be "contrary to Congress' intent as determined according to rules of statutory construction and the relevant legislative history."[8] The Memorandum concludes with the assertion that "18 U.S.C. § 924(a)(5) does not apply to state officials and that the United States therefore lacks the authority to prosecute such officials for violations of the Act."[9]

The Department of Justice has clearly indicated an intent not to enforce the criminal sanctions provision of the Brady Act against law enforcement officers in connection with the background check provisions of the Brady Act, presumably including Sheriff Romero. Furthermore, Sheriff Romero has not presented this Court with any evidence to suggest that the local U.S. Attorney intends to act in violation of the Justice Department's clearly stated interpretation of the enforcement authority granted in the Brady Act. Therefore, plaintiff has not sustained his burden of proving that he is under an *imminent* threat of indictment sufficient to grant him standing to challenge the constitutionality of the criminal sanctions provision of the Brady Act.[10]

For the foregoing reasons, this Court does not have jurisdiction to hear plaintiff's Fifth Amendment challenge to the criminal sanctions provision of the Brady Act.

### The Tenth Amendment and the Commerce Clause

### I.

■ Complainant seeks a declaratory judgment that § 102(a) of the Brady Act is inconsistent with the Tenth Amendment and unconstitutional for that reason. As noted above, Sheriff Romero cannot assert a claim for equitable relief unless he proves his standing to bring such a claim. Standing requires the existence of an injury in fact, a causal connection between the injury and the conduct complained of, and the likelihood that the injury will be redressed by a favorable decision.[11]

The parties have stipulated to the harm actually caused and threatened by the Brady Act. The law creates a political dilemma for Sheriff Romero. "[The Brady Act] puts him in the middle of the conflict between those citizens of Iberia Parish who firmly believe that the provisions of the Brady Handgun Control Act unconstitutionally infringes [sic] upon their right to bear arms and those who feel it is a legitimate exercise of Congressional authority."[12] This is precisely the type of injury which the Supreme Court has recognized that the Tenth Amendment and the constitutional structure are designed to avoid.[13] Sheriff Romero has Hobson's Choice of either being a law enforcement officer not enforcing the law, or enforcing a law he and many of his constituents believe is unconstitutional. Moreover, due to a serious funding shortage, compliance with the federal mandate will have the effect of making it impossible for Sheriff Romero to fulfill his duties as defined by Louisiana law. Irrespective of his choice, Sheriff Romero suffers the damage incumbent upon being politically accountable for an action taken by Congress, for which he was not responsible.

---

**8.** *Id.,* at 3.

**9.** *Id.*

**10.** *See Allen v. Wright,* 468 U.S. 737, 755, 104 S.Ct. 3315, 3326–27, 82 L.Ed.2d 556 (1984) (citing *O'Shea v. Littleton,* 414 U.S. 488, 94 S.Ct. 669, 38 L.Ed.2d 674 (1974), and *Rizzo v. Goode,* 423 U.S. 362, 96 S.Ct. 598, 46 L.Ed.2d 561 (1976)) (Plaintiff who cannot show that he has been or would likely be subject to the challenged government conduct lacks standing to contest the conduct).

**11.** *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 559–61, 112 S.Ct. 2130, 2136, 119 L.Ed.2d 351 (1992).

**12.** Stipulation, paragraph 3.

**13.** Where Congress *encourages* state regulation rather than compelling it, state governments remain responsive to the local electorate's preferences; state officials remain accountable to the people..... But where the Federal Government *directs* the States to regulate, it may be state officials who will bear the brunt of public disapproval, while the federal officials who devised the regulatory program may remain insulated from the electoral ramifications of their decision.

*New York v. United States,* 505 U.S. 144, ——, 112 S.Ct. 2408, 2424, 120 L.Ed.2d 120 (1992) (emphasis added).

Plaintiff has sustained his burden of proving he has suffered—and continues to suffer—an injury in fact. Furthermore, the injury to Sheriff Romero's political standing directly results from the Congressional imposition of law enforcement duties above and beyond those described and defined in Louisiana law. Finally, a ruling by this Court on the question of the constitutionality of § 102(a) of the Brady Act will resolve the plaintiff's political dilemma: either he will be proven right in choosing not to enforce the law, or he will be deprived of a valid excuse for failing to do so.

For the foregoing reasons, this Court finds that it has jurisdiction to hear Sheriff Romero's request for equitable relief from the duties imposed upon him by § 102(a) of the Brady Act.

## II.

Sheriff Romero alleges that the provisions of § 102(a) of the Brady Act which impose duties upon him, as a state officer, are beyond the enumerated powers granted to Congress in the United States Constitution and, therefore, are inconsistent with the Tenth Amendment. The Brady Act, as noted above, requires local Chief Law Enforcement Officers ("CLEOs"), upon receiving notice from a gun dealer of an applicant's desire to purchase a handgun, to make a reasonable effort to ascertain whether the proposed gun purchase would violate federal, state, or local law.[14] In addition to undertaking such research, the CLEO is required, where the purchase would not violate the law, to destroy both the application and the materials accumulated during the research thereof.[15] Finally, if a purchase is disapproved, the CLEO is required, upon request, to issue a letter stating the reasons for such disapproval.[16] Under the statute, all of the foregoing actions expose the CLEO to liability for attorney's fees which might be incurred by anyone bringing an action based upon the CLEO's recommendation to the gun dealer.[17]

The Brady Act imposes duties on CLEOs exclusively in the context of their *official capacities as officers of the states.* The provisions are clearly designed to regulate and control *States' methods* of enforcing their own and federal criminal statutes concerning possession of handguns. This regulation of CLEOs'. *law enforcement methods,* rather than commercial activities, suggests the purpose of these provisions is not regulation of commerce but of an essential element of state sovereignty: maintenance of public order.

■ The Tenth Amendment to the U.S. Constitution limits the exercise of power by the U.S. Government. "The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people."[18] In view of this express limitation upon the federal government's authority, a Congressional enactment is constitutionally proper only if it is enacted pursuant to an enumerated power granted Congress in the Constitution.

The United States invokes the Commerce Clause, and no other, as the source of its authority to enact the Brady Act.[19] "The Congress shall have Power ... To regulate Commerce ... among the several States...."[20] In regulating pursuant to its enumerated powers, the Constitution also grants Congress the authority "[t]o make all laws which shall be necessary and proper" in pursuit of such regulation.[21]

■ In analyzing the interplay between the Tenth Amendment and the Commerce Clause, the Supreme Court, in some cases, has inquired "whether an Act of Congress is authorized by one of the powers delegated to

14. 18 U.S.C. § 922(s)(2).

15. 18 U.S.C. § 922(s)(6)(B)(i).

16. 18 U.S.C. § 922(s)(6)(C).

17. 18 U.S.C. § 925(a).

18. U.S. Constitution. amend. X.

19. *See* Defendant's Supplemental Brief, at 7.

20. U.S. Constitution art. 1, § 8, cl. 3.

21. U.S. Constitution art. 1, § 8, cl. 18.

**1082**

Congress in Article I of the Constitution." [22] In other circumstances, the Supreme Court has approached the issue by asking "whether an act of Congress invades the province of state sovereignty reserved by the Tenth Amendment." [23] Most recently, the Court has noted that the two questions are mirror images of each other. [24] "[T]he Tenth Amendment confirms that the power of the Federal Government is subject to limits that may, in a given instance, reserve power to the States." [25] Thus, the ultimate determination to be made in an analysis of whether an Act of Congress violates the Tenth Amendment is "whether an incident of state sovereignty is protected by a limitation on an Article I power." [26]

The Supreme Court has, thus far, declined to clearly establish an analytical framework for determining whether a particular Act is consistent with the Tenth Amendment, the Commerce Clause and the federalist concept of state sovereignty inherent in the Constitutional structure. This Court has closely scrutinized the Supreme Court's efforts to delineate a method for interpreting and applying the various concepts relevant to the circumstances found in this case. Each effort seems simply to make the morass of language and meaning more difficult to discern. [27] There are, however, at least two appropriate analyses which have been used which are relevant to the instant challenge. As the same result obtains under either analysis, both are set out hereinbelow.

**A.**

The Commerce Clause, according to well-established jurisprudence of the United States Supreme Court, grants Congress plenary authority to regulate all interstate commercial activity as well as intrastate commercial activity which has a substantial impact upon interstate commerce. [28] "The allocation of power contained in the Commerce Clause, for example, authorizes Congress to regulate interstate commerce directly; it does not authorize Congress to regulate state governments' regulations of interstate commerce." [29] "[T]he Constitution has never been understood to confer upon Congress the ability to require the States to govern according to Congress' instructions." [30] This position derives from the Framers' choice to allow Congress to exercise its legislative authority directly over *individuals* rather than over *States*. [31]

The provisions of the Brady Act under challenge herein clearly seek to regulate the state's regulation and impose duties upon the *states* through their CLEOs, and therefore regulate state enforcement officials' methods of enforcing state, local, and federal criminal laws. The Commerce Clause does not authorize Congress to regulate *states' regulation of commerce, a fortiori* it does not allow federal regulation of the states' CLEOs' methods of law enforcement as a method of regulating interstate commerce. [32] As the

22. *New York v. United States,* 505 U.S. 144, ——, 112 S.Ct. 2408, 2417, 120 L.Ed.2d 120 (1992).

23. *Id.*

24. *Id.*

25. *Id.* 505 U.S. at ——, 112 S.Ct. at 2418.

26. *Id.*

27. *New York v. United States,* 505 U.S. 144, 112 S.Ct. 2408, 120 L.Ed.2d 120 (1992); *Garcia v. San Antonio Metropolitan Transit Authority,* 469 U.S. 528, 105 S.Ct. 1005, 83 L.Ed.2d 1016 (1985); *Equal Employment Opportunity Commission v. Wyoming,* 460 U.S. 226, 103 S.Ct. 1054, 75 L.Ed.2d 18 (1983); *Federal Energy Regulatory Commission v. Mississippi,* 456 U.S. 742, 102 S.Ct. 2126, 72 L.Ed.2d 532 (1982); *Hodel v. Virginia Surface Mining and Reclamation Associ-*

*ation, Inc.,* 452 U.S. 264, 101 S.Ct. 2352, 69 L.Ed.2d 1 (1981).

28. *See Federal Energy Regulatory Commission v. Mississippi,* 456 U.S. at 754 n. 18, 102 S.Ct. at 2134 n. 18.

29. *New York v. United States,* 505 U.S. at ——, 112 S.Ct. at 2423.

30. *Id.* 505 U.S. at ——, 112 S.Ct. at 2421.

31. *Id.* 505 U.S. at ——, 112 S.Ct. at 2422.

32. Of course, the Constitution does clearly place limits on state law enforcement methods: the Fourth Amendment, Fifth Amendment and Sixth Amendment, as applied to the states through the Fourteenth Amendment, do not allow many types of activities by law enforcement authorities. However, the United States has clearly stated that the provisions at issue herein were enacted

relevant provisions of the Brady Act are not authorized under the Commerce Clause, they are inconsistent with the Tenth Amendment to the United States Constitution.

### B.

While the foregoing analysis relies upon explicit language contained in several Supreme Court cases, the Court's use of language which could be argued as quite broad—and perhaps contradictory—in this area of constitutional consideration calls into question whether such a simple analysis will be found sufficient. The jurisprudence might be distilled to derive an alternative analysis which does not simply foreclose Congress from regulating local law enforcement methods under the Commerce Clause, but looks to the *type of regulation* at issue for a determination of whether it is constitutionally permissible.

A Court will uphold legislation enacted under the Commerce Clause power if two requirements are met: (1) a Congressional finding that a regulated activity affects interstate commerce will be sustained if there is any *rational basis* for such a finding; and (2) the means selected by Congress must be *reasonably adapted* to the end permitted by the Constitution.[33] There is no argument— and this Court will not belabor the point by reiterating the obvious—that Congress can and has regulated handguns under the auspices of the Commerce Clause based upon the effect on interstate commerce of the purchase of handguns. Moreover, the method of regulation chosen by Congress—creating a new requirement that gun sellers notify local law enforcement of the proposed handgun purchase and allow time for a criminal background check prior to the transfer—is a means reasonably adapted to the control of interstate commerce in handguns. Thus, the Brady Act meets the Commerce Clause threshold test of constitutionality. The question remains, however, whether the Brady Act, *in its method* of regulating handgun transfers, encroaches upon an incident of state sovereignty protected by the Tenth Amendment's limitation on the Commerce Clause.

Where the question is not merely whether Congress had the authority to regulate a particular area of commerce, but whether the Commerce Clause grants Congress the authority to instruct the states to act pursuant to federal edict, the analysis looks closely at the particular mandate in determining its constitutionality. The Supreme Court has established some bright line rules regarding the extent of Congress' authority to intrude upon state sovereignty. To date, under no circumstances may Congress order the states to legislate in accordance with a national mandate.[34] However, Congress clearly does have the authority to order states' judiciary officers to enforce federal law.[35] Congress is also allowed to subject states to regulations imposed upon commercial activities generally.[36] Yet a fourth bright line rule is that

pursuant to the Commerce Clause—not the Fourteenth Amendment.

33. *Preseault v. Interstate Commerce Commission*, 494 U.S. 1, 17, 110 S.Ct. 914, 924, 108 L.Ed.2d 1 (1990).

34. *New York v. United States*, 505 U.S. at ——, 112 S.Ct. at 2420 ("Congress may not simply 'commandee[r] the legislative processes of the States by directly compelling them to enact and enforce a federal regulatory program.' ") (citing *Hodel v. Virginia Surface Mining and Reclamation Assoc., Inc.*, 452 U.S. 264, 288, 101 S.Ct. 2352, 2366, 69 L.Ed.2d 1 (1981)).

35. *Testa v. Katt*, 330 U.S. 386, 67 S.Ct. 810, 91 L.Ed. 967 (1947).
  In *Testa*, the Court ruled that Congress, through the Emergency Price Control Act—clearly a Congressional exercise of *Commerce Clause* power—was allowed to co-opt state courts for

enforcement of the Act because of the *Supremacy Clause's* mandate that federal law is supreme throughout this nation. Due to the circularity of its rationale and the failure to distinguish between a Commerce Clause analysis and a Supremacy Clause analysis, *Testa* perhaps, is not a model of clarity in constitutional adjudication. In *Federal Energy Regulatory Commission v. Mississippi*, the Supreme Court overlooked the decision's potential shortcomings and cited *Testa* as support for the proposition that the Commerce Clause allows Congress to require state agencies to adjudicate disputes arising under federal law where that is the very type of activity customarily performed by the agency.

36. *See generally, New York v. United States*, 505 U.S. 144, 112 S.Ct. 2408, 120 L.Ed.2d 120 (1992); *South Carolina v. Baker*, 485 U.S. 505, 108 S.Ct. 1355, 99 L.Ed.2d 592 (1988); *Garcia v. San Antonio Metropolitan Transit Authority*, 469

where an area of state regulation is preemptible, Congress is allowed to "encourage" or "influence" states to act, legislate, adjudicate, or enforce in accordance with federal standards, irrespective of the intrusive nature of the request, so long as there is no coercion and the states are free to choose not to regulate the commercial activity and, thus, not comply with the Congressional "request."[37]

The mandates on CLEOs contained in the Brady Act do not fall into any of the bright line categories of present Tenth Amendment jurisprudence. With the Brady Act, Congress has not ordered the states to legislate or to adjudicate, nor has it ordered the judiciary to act; it has ordered the state through its executive officers to enforce federal, state, and local gun possession statutes by researching possible criminal violations before they take place. Of note is the fact that the provisions at issue do not apply to individuals or anyone other than the specified *state officials*. While the Government does argue that Congress has created a permissive statute which merely gives the states an option to perform in accordance with Congressional wishes, this Court finds that position to be contrary to the express language of the Act and without merit.

The language imposing the duty on CLEOs is clearly mandatory in nature:

"A chief law enforcement officer to whom a transferor has provided notice pursuant to [this section] *shall make a reasonable effort* to ascertain within five (5) business days whether receipt or possession would be in violation of the law, *including research in whatever State and local record-keeping systems are available and in a national system designed by the Attorney General.*" 18 U.S.C. § 922(s)(2) (emphasis added).

While the statute does not specify a set sequence of particular procedures to be followed, the language clearly mandates *some* action in response to each notice. The Government argues that the reasonableness standard incorporated into the statute minimizes the mandatory effect of this language. In so doing, Government counsel describe the statutory duty in benign—almost permissive—language.[38]

As support for its argument that the Brady Act's duties are permissive in nature, the Government has provided the Court evidence of the position taken by the ATF *at this time* on the statute's mandate. This evidence is in the form of a copy of an Open Letter to State and Local Law Enforcement Officers from the Bureau of Alcohol, Tobacco & Firearms ["ATF"] dated January 21, 1994, which includes the following passage: "Each law enforcement agency serving as the CLEO will have to set it [sic] own standards based on its own circumstances, i.e., the availability of resources, access to records, and taking into account the law enforcement priorities of the jurisdiction."[39] However, the Open Letter also. states that, "In terms of the initial search, *the law clearly anticipates some minimal effort* to check commonly available

U.S. 528, 105 S.Ct. 1005, 83 L.Ed.2d 1016 (1985); *Equal Employment Opportunity Commission v. Wyoming*, 460 U.S. 226, 103 S.Ct. 1054, 75 L.Ed.2d 18 (1983).

37. *New York v. United States*, 505 U.S. at ——, 112 S.Ct. at 2423 (Congress offered states the choice of either regulating disposal of radioactive waste according to federal standards or be denied access to disposal sites throughout the nation); *Federal Energy Regulatory Commission v. Mississippi*, 456 U.S. at 766, 102 S.Ct. at 2141 (States have the "choice" of either abandoning their regulation of public utilities altogether, or doing so in accordance with federal mandate, because utilities constitute an area of interstate commerce subject to preemption by Congress); *Hodel v. Virginia Surface Mining & Reclamation Assoc., Inc.*, 452 U.S. at 288, 101 S.Ct. at 2366 (States may choose to participate in regulation of surface mining, in accordance with federal guidelines, but is under no compulsion to do so).

38. "To the extent that [the statute] involves local officials such as plaintiff at all, *it leaves it to their discretion to decide* what, if any, amount of investigation of a potential handgun purchaser is reasonable, and it *imposes only the most ministerial obligations on them.*" Defendant's Opposition to Plaintiff's Motion for Preliminary Injunction, at 3. "Should plaintiff find that the interdiction and investigation of crimes takes up all of his available resources, ... *it would be eminently reasonable*—and compatible with both the Brady Act and ATF's open letter—*for him to decide that at any given time, he is unable to devote any of resources to Brady Act background checks.* In other words, *a reasonable effort may be no effort at all.*" *Id.* at 22 (emphasis added).

39. *Id.* at 10.

records."[40] In view of ATF's explicit recognition that the law *mandates at least some* minimal effort with every application and the explicit language of the Act, the Government's position that Sheriff Romero will be able to completely avoid the mandate of the Brady Act simply by determining that he is too busy elsewhere is, at the very best, a misreading of the language of the statute and the Open Letter. The statute clearly imposes and the Bureau of Alcohol Tobacco & Firearms admits the statute imposes *mandatory* duties upon state officials, thus precluding this case from properly being placed in the bright line category for Congressional "encouragement" of state actions in regulating preemptible areas of commerce.

As the Brady Act does not fall into any of the bright line clearly-defined categories of Tenth Amendment jurisprudence, a deeper foray into the tangle of existing Supreme Court holdings and language is necessary. The jurisprudence illustrates the primary and overriding tension in cases interpreting the Tenth Amendment is that Congress cannot be allowed to jeopardize the continued vitality and independence of states as sovereign entities separate and distinct from the federal government.[41]

In some circumstances, the Supreme Court has allowed Congress to impose duties upon state officials where the additional duties do not expand the scope of the officials' responsibilities. In *Federal Energy Regulatory Commission v. Mississippi*, the Supreme Court upheld the Commission's decision to impose upon Mississippi administrative authorities a duty to adjudicate disputes arising under the Public Utilities Regulatory Policies Act ("PURPA"), relying upon its precedent in *Testa v. Katt*.[42] Both *Testa v. Katt* and *Federal Energy Regulatory Commission v. Mississippi* are distinguishable from the instant matter in several instances, first, because they impose duties upon state judiciary officers, which allowed the Supreme Court, in both cases, to invoke the Supremacy Clause as additional justification for imposing the adjudicatory duties in those cases. In contrast, Sheriff Romero is clearly not a member of the judicial branch of state government, nor does the Brady Act impose adjudicatory duties upon CLEOs. Consequently, the judiciary and the Supremacy Clause are not involved.

Second, *Federal Energy Regulatory Commission v. Mississippi* is distinguishable from the instant case in its rationale. "[T]he statute and the implementing regulations simply require the Mississippi authorities to adjudicate disputes arising under the statute. *Dispute resolution of this kind is the very type of activity customarily engaged in by the Mississippi Public Service Commission.*"[43] In other words, the Congressional action in *Federal Energy Regulatory Commission v. Mississippi* did not expand the scope of the officials' responsibilities. The Brady Act, however, does expand the scope of CLEOs' responsibilities and does so, in this instance, in a manner which precludes the official from performing his state duties. Sheriffs in the State of Louisiana are not required under state law to perform background checks on or issue letters to individuals desiring to purchase a handgun. Further, a state law requiring such activity would have to be crafted so as not to violate the provisions of Article 1, § 5 of the Louisiana Constitution of 1974 which provides: "The right of each citizen to keep and bear arms shall not be abridged."

Further, Sheriff Romero argues and the government admits to the stipulation that Sheriff Romero faces a severe funding shortage and the cost of following the mandates of the Brady Act would prohibit Sheriff Romero from carrying out the state's mandates to preserve public order. Consequently, in

---

**40.** *Id.* at 9 (emphasis added).

**41.** *See New York v. United States*, 505 U.S. at ——, ——, 112 S.Ct. at 2421, 2443 (White, J., partially dissenting); *Federal Energy Regulatory Commission v. Mississippi*, 456 U.S. at 765, 102 S.Ct. at 2141; *State of Texas v. United States*, 730 F.2d 339, 356 (5th Cir.), *cert. denied*, 469 U.S. 892, 105 S.Ct. 267, 83 L.Ed.2d 203 (1984).

**42.** *Federal Energy Regulatory Commission v. Mississippi*, 456 U.S. at 760–61, 102 S.Ct. at 2137–38.

**43.** *Id.* at 760, 102 S.Ct. at 2137 (emphasis added).

Sheriff Romero's situation, the Brady Act's unfunded mandates strip the state of the ability to preserve public order in his jurisdiction. This was not the case with the congressional action in *Federal Energy Regulatory Commission v. Mississippi.* First, Congress did not expand the scope of duties in *Federal Energy Regulatory Commission v. Mississippi;* second, in *Federal Energy Regulatory Commission v. Mississippi* Congress recognized that a state's compliance with PURPA would involve expenditure of funds and therefore, it authorized grant funding for states to assist them in carrying out the requirements of PURPA.[44] Thus, upon full review, *Federal Energy Regulatory Commission v. Mississippi* does not control herein because its rationale is not applicable in these circumstances.

Yet another factor on which constitutionality of Congressional enactments under the Commerce Clause turns is whether the area of regulation is preemptible. As noted above, Congress has plenary authority to regulate all attributes of interstate commerce. The Court's jurisprudence has made it clear that Congress may preempt state regulation of private activity affecting interstate commerce in all its forms.[45] However, as discussed above, an additional limit on Congress' authority under the Commerce Clause is the definition of "commerce." Another limit is the Tenth Amendment itself, which precludes preemption of state regulation where doing so would sufficiently interfere with an incident of state sovereignty.[46]

The Supreme Court has not provided extensive guidance to aid in determining which incidents of state sovereignty are fully protected by the Tenth Amendment. Clearly, the power to determine the legislative agenda, and to be free of Congressional mandates

to legislate, is an incident of state sovereignty.[47] Just as clearly, control over the terms and conditions of employment is not such an incident of state sovereignty.[48] The parties have not cited this Court to any further jurisprudence helpful in defining "incidents of state sovereignty," nor has this Court discovered any additional guidance in its own research of the issue beyond the integral relationship and construction of and between the Constitution and its amendments. However, it is possible to extrapolate at least one such incident of state sovereignty, without the necessity for defining all incidents, from the very nature of state sovereignty: maintenance of public order.

The State of Louisiana has created sheriffs' offices throughout its territory as part of its regulatory mechanism for maintaining public order within its borders. It must be without question that a crucial element of sovereignty is the power to maintain public order within the sovereign's territory. It is clear to this Court that, irrespective of the parameters of the "incidents of state sovereignty" definition, the maintenance of public order must come within those parameters.

One way in which the State of Louisiana exercises its sovereign right of maintaining public order within its borders is by defining and assigning the duties of its sheriffs, through its Constitution and statutory enactments. To strip the sheriffs of their ability to maintain public order and thus strip the state of its ability to assign and define the duties of its sheriffs clearly totally removes one incident of state sovereignty.

Intercepting possible criminal activity by performing background checks of individuals seeking to purchase handguns is not among the duties which have been assigned to sher-

---

44. *Id.* at 751 n. 14, 102 S.Ct. at 2133 n. 14.

45. *Hodel v. Virginia Surface Mining and Reclamation Association, Inc.,* 452 U.S. at 290, 101 S.Ct. at 2367 ("A wealth of precedent attests to congressional authority to displace or pre-empt state laws regulating private activity affecting interstate commerce when these laws conflict with federal law.").

46. *New York v. United States,* 505 U.S. at ——, 112 S.Ct. at 2418.

47. *See New York v. United States,* 505 U.S. 144, 112 S.Ct. 2408, 120 L.Ed.2d 120 (1992).

48. *See Garcia v. San Antonio Metropolitan Transit Authority,* 469 U.S. 528, 105 S.Ct. 1005, 83 L.Ed.2d 1016 (1985) (states subject to provisions of the Fair Labor Standards Act); *Equal Employment Opportunity Commission v. Wyoming,* 460 U.S. 226, 103 S.Ct. 1054, 75 L.Ed.2d 18 (1983) (states subject to the Age Discrimination in Employment Act).

iffs by state law. To conform with the federal mandate would preclude the sheriffs from conforming with the state's mandate to maintain public order.[49] As a consequence, the Brady Act is not in the tradition approved in *Federal Energy Regulatory Commission v. Mississippi.* By mandating additional law enforcement duties which would prevent Sheriff Romero from fulfilling his statutorily-defined duties, the Brady Act significantly impairs the ability of the states to function effectively in a federal system.[50]

Yet another exercise of sovereign power is allocation of funding for Sheriffs' Offices. The parties have stipulated that, due to an extreme shortage of funding, one inevitable effect of the Brady Act would be to preclude Sheriff Romero from fulfilling the duties imposed upon him by the State of Louisiana. By imposing the Brady Act's unfunded mandate on the states, Congress has displaced Louisiana's policy and priority determinations in the crucial area of maintaining public order. For every dollar spent fulfilling the Brady Act's mandate, Sheriff Romero would have one less dollar available for performing the duties assigned him *by law* to the effect that Sheriff Romero would be unable to perform those duties assigned him by the state. Of crucial import in this matter is that the facts establish that the mandates of the Brady Act go beyond mere interference in the states' right to control and effectuate their own law enforcement priorities. The effect of the Brady Act in this case is *to remove Sheriff Romero's ability to perform certain tasks assigned him by the state* which preserve the public order and therefore remove their sovereign authority to maintain public order in Iberia Parish.

As the ability to establish a mechanism for maintaining public order, and the means of effectuating public order in accordance with determined policies and priorities, clearly must be incidents of state sovereignty crucial to the continued vitality and independence of states as sovereign entities, this Court finds that the Tenth Amendment limits Congress from preempting state regulation for the maintenance of public order. Moreover, the ability to control its law enforcement officers, methods of law enforcement and law enforcement funding priorities are necessary elements of any sovereign's ability to maintain public order. Thus, the Tenth Amendment precludes Congress, under the auspices of the Commerce Clause, from issuing mandates which obstruct states' exercise of their ability to preserve public order, or from ordering the states' law enforcement officers to preserve public order in accordance with federally-defined procedures.

If Congress is precluded from preempting the states' maintenance of public order, the question becomes whether, and to what extent, Congress may occupy the regulatory arena at issue. The parties have not cited this Court to any case law addressing this question. Without any Supreme Court or Fifth Circuit guidance on this question, this Court can only assume that Congress' exercise of its Commerce Clause authority concerning an incident of state sovereignty would be either equivalent to, or less than—but certainly not more than—its authority to regulate preemptible interstate commerce activities.

Outside of the exceptions noted above,[51] Congress is allowed to preempt state regulation of interstate commerce, but cannot mandate states' regulation in accordance with federal law. Rather, Congress must give states a choice of whether to regulate in accordance with federal mandate or, in the alternative, to abstain from regulating at all.[52] This is so because the constitutional

---

**49.** The parties stipulate to the facts before this Court. Contained within those facts is the assertion that Sheriff Romero operated under a severe funding shortage and to perform the duties required by the Brady Act would require the sheriff to pull officers from their regular law enforcement duties leaving those duties unperformed.

**50.** *Federal Energy Regulatory Commission,* 456 U.S. at 765, 102 S.Ct. at 2141.

**51.** Congress may mandate state judiciary officers to enforce federal law, or subject states to mandatory commercial regulations.

**52.** *See New York v. United States,* 505 U.S. 144, 112 S.Ct. 2408, 120 L.Ed.2d 120 (1992) (Court upheld statute granting states the choice of either regulating disposal of low-level radioactive waste or, in the alternative, being charged additional fees for disposal in other states); *Federal Energy Regulatory Commission v. Mississippi,* 456 U.S.

structure allows Congress to regulate *individuals,* not states.

> [E]ven where Congress has the authority under the Constitution to pass laws requiring or prohibiting certain acts, it lacks the power directly to compel the States to require or prohibit those acts.... The allocation of power contained in the Commerce Clause, for example, authorizes Congress to regulate interstate commerce directly; it does not authorize Congress to regulate state governments' regulation of interstate commerce.[53]

In the Brady Act, Congress achieves regulation of state law enforcement officials under the guise of regulating interstate commerce. By acting to control state law enforcement methods rather than controlling interstate commerce itself, Congress has gone one step too far.

Thus, even where Congress' authority is supreme, it cannot simply dictate that states shall regulate interstate commerce in accordance with congressionally-imposed rules. Yet, that is precisely what Congress has done under the Brady Act. As noted above, the Act clearly contains *mandates* to CLEOs in their official state capacities. These mandates impose duties on CLEOs to act, in their official state capacities, in accordance with federal directives. The Act's new duties constitute *an edict* that CLEOs shall prevent possible violation of local, state, or federal handgun regulations by certain ordained law enforcement methods, i.e. background checks and explaining negative results of those checks, but destroying the accumulated information where no potential violation is found.

The mandatory nature of the duties created in the Brady Act places the Act outside of the scope of Congress' Commerce Clause authority in the context of regulating state governments. Such regulation of *states'* and of the *states'* daily activities in pursuit of maintaining public order, ostensibly pursuant to Commerce Clause authority, is beyond the limits placed upon Congress by the Tenth Amendment.

For the foregoing reasons, this Court finds the challenged provisions of § 102(a) of the Brady Handgun Violence Prevention Act, codified at 18 U.S.C. § 922(s)(2), (s)(6)(B–C), to be inconsistent with the Tenth Amendment to the United States Constitution and, therefore, unenforceable by the United States of America.

### *Severability*

■ The final question that this Court must address is the issue of severability of the unconstitutional provisions, 18 U.S.C. §§ 922(s)(2), 922(s)(6)(B–C), from the remainder of the Brady Handgun Control Act. Plaintiff argues that the unconstitutional portions of § 922(s) are the "heart and foundation of that entire subsection and thus, would not be severable, with the result that the entirety of 18 U.S.C. § 922 should be declared unconstitutional."[54]

"Unless it is evident that" Congress would not have enacted the constitutional provisions in a statute independently of any unconstitutional ones, "the invalid part may be dropped if what is left is fully operative as law."[55] If a statute includes a severability clause, as the Gun Control Act does,[56] there is a presumption that any of its provisions found to be unconstitutional are severable.[57]

---

**53.** *New York v. United States,* 505 U.S. at ——, 112 S.Ct. at 2423.

**54.** Plaintiff's Motion for Preliminary Injunction, at 18–19.

**55.** *New York v. United States,* 505 U.S. at ——, 112 S.Ct. at 2434 (quoting *Alaskan Airlines, Inc. v. Brock,* 480 U.S. 678, 684, 107 S.Ct. 1476, 1480, 94 L.Ed.2d 661 (1987)).

**56.** 18 U.S.C. § 928.

**57.** *Alaskan Airlines,* 480 U.S. at 686, 107 S.Ct. at 1481.

742, 102 S.Ct. 2126, 72 L.Ed.2d 532 (1982) (Court upheld statute imposing requirement to consider enacting new rate schedules, as well as use of federally-mandated procedure on states which chose to continue regulating public utilities); *State of Texas v. United States,* 730 F.2d 339, 353 (5th Cir.) *cert. denied,* 469 U.S. 892, 105 S.Ct. 267, 83 L.Ed.2d 203 (1984). (Court upheld constitutionality of the Staggers Act which preempts state law governing intrastate railroad rates, "but gives the states the option either to continue regulation in compliance with federal law or to cease independent regulation altogether.")

This Court has found the Brady Act's mandates to CLEOs unconstitutional. Considering the arguments made by the United States,[58] this Court believes that the primary goal of the Brady Handgun Control Act, a five-day waiting period for handgun purchases and the sharing of information between handgun dealers and local law enforcement officials, continues to be served even though this Court has invalidated the mandates to CLEOs. Further, although released from the mandate, CLEOs will maintain the option of acting on any given notice from a handgun dealer, at their option and in pursuit of their own law enforcement priorities and policies.

Therefore, this Court finds that plaintiff has not overcome the presumption that Congress would not have passed the Brady Act unless the mandates had been included and therefore, this Court finds that said section is severable and that the Brady Handgun Control Act remains "fully operative as law."[59]

### Conclusion

In conclusion, this Court has found Sheriff Romero does not have standing to prosecute a Due Process vagueness challenge to the criminal sanctions provision of the Brady Act, 18 U.S.C. § 924(a)(5). The Due Process challenge is DISMISSED. Furthermore, the challenged provisions imposing federal mandatory duties upon CLEOs is inconsistent with the Tenth Amendment to the United States Constitution and is, for that reason, UNCONSTITUTIONAL. The United States is permanently enjoined from enforcing 18 U.S.C. § 922(s)(2), 18 U.S.C. § 922(s)(6)(B)(i), and 18 U.S.C. § 922(s)(6)(C). The remainder of the Brady Act being functional and fully operative as law, the unconstitutional provisions are severed therefrom and continue in full force and effect.

### MEMORANDUM RULING ON MOTION TO AMEND FINDINGS AND TO ALTER JUDGMENT

Before the Court is a Motion for Amendment of Findings and to Alter Judgment filed on behalf of defendant, the United States of America. Plaintiff, Sheriff Errol Romero, opposes the motion.

Defendant asserts that this Court's analysis of the constitutionality of the Brady Act turned on "mistaken factual findings," which defendant now requests this Court to correct. Defendant asserts that this Court incorrectly concluded that the parties stipulated that it would be impossible for plaintiff to discharge his duties under state law and also comply with his responsibilities under the Brady Act as the chief law enforcement officer (CLEO) for Iberia Parish. Defendant states, "The parties agreed to no such stipulation, however, and that is not the government's interpretation of the Brady Act." (Memorandum in Support, p. 1). This statement reveals that the defendant is in fact asserting two (2) points: (1) the government's interpretation of the Brady Act; and (2) how with this interpretation there cannot result a joint stipulation as described by the Court.

With regard to the government's interpretation of the Brady Act, this Court notes that defendant has put forth the same arguments this Court addressed in its Memorandum Ruling at pp. 16–18. The government has argued and continues to argue that the reasonableness standard incorporated into the Brady Act minimizes the mandatory effect of the language imposing a duty on CLEOs such that a "reasonable" Brady Act check could be "no check at all." As fully explained in this Court's previous ruling, this Court has found the government's interpretation of the Act to be incorrect. "While the statute does not specify a set sequence of particular procedures to be followed, the language clearly mandates *some* action in response to each notice." (Memorandum Ruling, p. 17).

Secondly, defendant asserts that it did not agree to the "Stipulated Facts" as described by the Court in its Memorandum Ruling. Specifically, defendant quotes the following from the Court's ruling:

Due to lack of sufficient funding, Sheriff Romero does not have the ability both to

---

58. *See* Defendant's Opposition to Plaintiff's Motion for Preliminary Injunction, at 25–30.

59. *Alaskan Airlines,* 480 U.S. at 684, 107 S.Ct. at 1480.

completely fulfill his duties as defined by the State of Louisiana and to undertake the additional duties mandated by the Brady Act.

Defendant asserts that it simply agreed to "what plaintiff's testimony would have been, had he been called to testify." (Memorandum in Support, p. 5). Defendant contests the factual basis of plaintiff's testimony in its Memorandum in Support of its Motion to Amend and in its previous submission to this Court *not by proffering any evidence* or arguing that if plaintiff performed *any of the duties* required by the Brady Act, plaintiff also could fulfill his state law duties, but by arguing its *interpretation* of the Act, which for the reasons already given, this Court finds incorrect. Defendant has submitted no evidence to contradict plaintiff's testimony and therefore, this Court accepts that testimony as fact and therefore finds that plaintiff is unable to both fulfill his duties as defined by Louisiana law and undertake those additional duties—whatever they might be—which are required of him by the Brady Act. Therefore, this Court has found and continues to find that if plaintiff were to testify he would testify that:

> The implementation of the Brady Handgun Control Act and the commands put upon him under its provisions as chief law enforcement officer will subject him to irreparable injury in that he does not now have sufficient funds or resources to comply with the provisions of the act and to do so would eliminate his ability to perform those functions which he is required to perform under the laws of the state of Louisiana.

*See* Affidavit in Support of Motion for Temporary Restraining Order at 3.

Accordingly, this Court DENIES defendant's Motion to Amend this Court's factual findings and the judgment will stand as rendered.

Defendant also requests this Court to alter its judgment by limiting application of the permanent injunction so that it only applies to plaintiff. This Court has found the challenged provisions of § 102(a) of the Brady Act to be in violation of the Constitution and, therefore, unenforceable by the United States. In its judgment, this Court permanently enjoined the United States from enforcing said provisions.

Defendant states that the injunction ordered by this Court "purports to be of nationwide scope." It then asserts that "in a non-class action, a court may not issue an injunction that benefits persons other than the named plaintiff unless it is necessary to do so in order for the plaintiff to obtain effective relief." (Memorandum in Support, p. 8). Defendant then directs the Court to various cases; however, this Court finds those cases to be not directly on point and distinguishable from the case before this Court. For instance, in *Califano v. Yamasaki,* 442 U.S. 682, 702, 99 S.Ct. 2545, 2558, 61 L.Ed.2d 176 (1979), the issue addressed by the Court was whether it was proper to certify a nationwide class action under Rule 23. In *PACE v. El Paso County Community College District,* 730 F.2d 258 (5th Cir.), *cert. denied,* 469 U.S. 881, 105 S.Ct. 248, 83 L.Ed.2d 186 (1984), a state agency, El Paso County Community College District, was sued under 42 U.S.C. § 1983, and an injunction was issued by the Court prohibiting certain conduct by the college that would be in violation of § 1983. In *Meinhold v. The United States Dept. of Defense,* 34 F.3d 1469, 1480 (9th Cir.1994), the Ninth Circuit limited the injunction issued by the district court because effective relief could be obtained "by directing the Navy not to apply its regulation to Meinhold based only on his statement that he is gay."

The Court finds the above cases cited by defendant not to be on point and to be distinguishable. In the instant case, this Court declared a federal law to be unconstitutional and, then, as a logical next step, issued the requested injunction prohibiting enforcement of the unconstitutional law. Moreover, the Court notes that a strong argument can be made that it does have the power to issue a nationwide injunction and that "there is no general requirement that an injunction affect only the parties in the suit." *Bresgal v. Brock,* 843 F.2d 1163, 1169–71 (9th Cir.1987) (citing *Evans v. Harnett County Board of Education,* 684 F.2d 304, 306 (4th Cir.1982); *Meyer v. Brown and Root Construction Co.,* 661 F.2d 369, 373–74 (5th Cir.1981)).

Although the proper scope of the injunction in a situation such as this is an interest-

ing question, this Court need not reach that issue for the following reasons. First, this Court is not unaware of the potential conflicts with courts of equal stature in other jurisdictions involving this matter both within and without the Fifth Circuit. Second, this Court is also cognizant that this matter, perhaps, is unique as there are numerous cases on this same issue making their way through the courts, all to be subject to review by a circuit court and perhaps ultimately by the United States Supreme Court. In particular, this Court notes there are two (2) other cases on this same issue now pending before the Fifth Circuit and four (4) other cases making their way through other circuits. Consequently, this Court is not unmindful of the need for an orderly process through the courts and the anticipated ruling by the Fifth Circuit which could settle this matter within this circuit. Accordingly, this Court hereby STAYS the enforcement of the injunction as to all individuals not party to this suit pending final resolution of this matter by the Fifth Circuit Court of Appeal.

For the above reasons, this Court DENIES defendant's Motion to Amend Findings and ALTERS its judgment as explained above.